**TRANS OCEAN VAN SERVICE**

v.

**The UNITED STATES.**

**No. 137–66.**

United States Court of Claims.

May 15, 1970.

Alan F. Wohlstetter, Washington, D. C., attorney of record, for plaintiff.

John C. Ranney, Washington, D. C., with whom was Asst. Atty. Gen. William D. Ruckelshaus, for defendant.

Before COWEN, Chief Judge, LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON, and NICHOLS, Judges.

## OPINION

COWEN, Chief Judge.*

The plaintiff, a California corporation, sues to recover additional compensation in connection with the transportation for the defendant (represented by the Department of Defense) of household goods belonging to military personnel between points in the continental United States and points overseas. This is a test case, and the final disposition of the issues involved in this case will govern the disposition of similar issues in many other cases that are pending before the court.

Since June 30, 1961, the plaintiff has been authorized by the Department of Defense to transport, for compensation, the household goods of military personnel between points in the continental United States and points overseas, by two modes of service:

(1) door-to-door container service; and

(2) door-to-door container-Government (MSTS) service, otherwise known as Mode 5.

Door-to-door container service involves the pre-packing and loading of each shipment of household goods into specially designed, carrier-owned containers at the origin residence of a military family, transporting the loaded containers to the port of departure, arranging for the movement of the shipment by ocean-going vessel or by air to the port of discharge, transporting the loaded containers beyond the port of discharge to the destination residence of the family, and placing the household goods into the new residence. The plaintiff assumes complete responsibility for the shipment from the point of origin to the point of destination.

Door-to-door container-Government (MSTS) service, or Mode 5, is identical with door-to-door container service except that water transportation between military ocean terminals is provided by vessels owned by, or under charter to, the defendant's Military Sea Transportation Service ("MSTS").

Prior to March 1, 1963, the plaintiff performed the transportation service previously described pursuant to various tenders which were submitted by the plaintiff to, and accepted by, the Department of Defense. Those tenders set forth in detail the rules, regulations, rates, and charges governing shipments of military household goods.

During the early 1960's, many other companies, in addition to the plaintiff, were engaged in the business of trans-

* The court acknowledges the assistance it has received from the report of Trial Commissioner Mastin G. White. We have adopted his opinion and findings of fact on most of the issues presented in this case.

porting military household goods for the Department of Defense by means of door-to-door container service and Mode 5. Each company performed such service pursuant to tenders which it individually submitted to the Department of Defense for acceptance.

By the fall of 1962, it had become apparent that the then-existing system of individual rate tender filings by carriers of military household goods precluded the efficient processing of the rate tenders by the Defense Traffic Management Service ("DTMS") of the Department of Defense. The transmission of rate information from DTMS to the transportation offices at military installations was unduly delayed by the manual processing of thousands of individual tenders. Accordingly, DTMS drafted a uniform basic tender with the idea that all companies engaged in the transportation of military household goods would be required to adopt the provisions of the uniform tender instead of formulating their own tenders on an individual basis.

Copies of the uniform basic tender drafted by DTMS were distributed by that agency to members of the household goods transportation industry on or about November 28, 1962. Members of the industry were informed by DTMS that all companies wishing to continue to participate in the transportation of military household goods must submit to DTMS not later than January 22, 1963, either individually or through an association to which they belonged, the uniform basic tender as a replacement for the many diverse tenders which the companies had previously submitted to DTMS. Members of the industry were further informed by DTMS that all tenders previously submitted would be canceled on February 1, 1963. Thus, the adoption by a company of the provisions of the uniform basic tender was a prerequisite to continued participation by the company in the household goods traffic of the Department of Defense.

The uniform basic tender drafted by DTMS was officially designated as Military Basic Tender No. 1 ("MBT No. 1"). It was duly filed with DTMS by the Household Goods Forwarders Association of America, Inc. ("Forwarders Association"), on behalf of the plaintiff and the other companies that belonged to the Forwarders Association. MBT No. 1 became effective on March 1, 1963; and it, as supplemented and reissued, covered all the shipments of military household goods that are involved in this case.

Generally speaking, the structure of compensation under MBT No. 1 was as follows: single-factor rates, filed by the carriers on electronic key-punch EAM cards, covered the entire straight-line transportation from origin to destination; MBT No. 1 itself covered the charges to be assessed for the performance of additional or accessorial services, and provided for allowances from the single-factor rates in certain circumstances.

A single-factor rate applied from a military installation in the continental United States, or from an area within a 50-mile radius thereof, to an entire country overseas; and, in the reverse direction, such a rate applied from a military installation overseas, or within a 50-miles radius thereof, to an entire State in the United States.

*The "Normal Port" Diversion Claims*

These claims arose out of situations wherein a shipment of military household goods would originate at an overseas point and be consigned to a certain point in the continental United States, and the shipment, after its arrival at the port of debarkation but prior to its departure therefrom, would be diverted in accordance with instructions from the defendant to a point in the United States other than the one stated in the bill of lading.

The question to be decided is the interpretation and application of the phrase "ordinarily be serviced," which

appears in the following portion of Item 150 of MBT No. 1:

DIVERTED PRIOR TO SHIPMENT LEAVING PORT OF DEBARKATION:

U.S. DESTINATION: If shipment is diverted to another point within the Continental United States that would ordinarily be serviced through the same Port of Debarkation, apply the single factor transportation rate applicable to the new destination point.

If shipment is diverted to another point within the Continental United States that would not ordinarily be serviced through the same Port of Debarkation, the Port of Debarkation will be considered the destination point and the single-factor transportation rate to such point will be applicable. Further transportation to the new destination point within the Continental United States will be at the diversion rate * * *.

Shipments Nos. 20 and 30 are illustrative of the "normal port" diversion claims. The facts with respect to the shipments are not in dispute and are set forth in findings 30–37. The parties are agreed that there was a diversion in each instance, but they disagree as to plaintiff's entitlement to mileage diversion charges provided for in Item 150 of MBT No. 1. Both shipments originated in Germany and were destined for Brooklyn, New York. After arrival at the Port of New York, shipment No. 20 was diverted by order of defendant to Rochester, New York, and shipment No. 30 was similarly diverted to Arcola, Illinois. On shipment No. 20, plaintiff billed the defendant for, and was paid, an amount based upon the single-factor rate between the point of origin in Germany and the Port of New York, plus a diversion fee of $5. On shipment No. 30, plaintiff billed the defendant for, and was paid, an amount based upon the single-factor rate between the point of origin in Germany and the Port of New York, plus the diversion mileage charge from the Port of New York to Arcola,

Illinois, and the $5 flat diversion fee. Thereafter, the General Accounting Office [hereinafter sometimes referred to as "GAO"] issued a notice of overcharge against the plaintiff with respect to the latter shipment. The amount of the overcharge, which plaintiff refunded, was computed by applying the single-factor rate from the point of origin in Germany to Arcola, Illinois, and adding the flat $5 diversion fee. Plaintiff here seeks to recover diversion mileage charges under Item 150 in the amount of $55.51 due for the movement of shipment No. 20 from the Port of New York to Rochester, New York, and in the amount of $115.58 for the movement of shipment No. 30 from the Port of New York to Arcola, Illinois.

As shown above, Item 150 provides in substance that when a shipment is diverted prior to leaving the port of debarkation to a destination which would not "ordinarily be serviced" by that port of debarkation, the single-factor rate applies from the point of origin to the port of debarkation, and the diversion mileage rate applies from the port of debarkation to the diverted destination. On the other hand, when the diverted destination would "ordinarily be serviced" by the port of debarkation, the single-factor rate applies from the point of origin to the diverted destination. Therefore, in assessing the applicable rates for such shipments that were diverted prior to leaving the port of debarkation, a determination must be made as to what port would ordinarily or normally service the diverted destination.

At the trial and in its brief, plaintiff took the position that the sole test to be employed in determining whether the port of debarkation is the normal port for the diverted destination is to ascertain whether such port is the port closest to the final destination point.

Prior to the time the shipments in issue moved, plaintiff had filed with the Department of Defense a document entitled "Non-Domestic Military Household Goods Service Tender," which, among other things, contained a list of plain-

tiff's port terminal agents in the United States and in some foreign countries. Also, with respect to shipments originating in some foreign countries, the tender listed certain stateside ports.

On shipments which moved prior to March 1, 1963, the GAO, in its audit of transportation bills submitted by plaintiff, referred to the list of stateside ports and then advised plaintiff that, in the absence of a definition in the service tender of the normal port of entry, the port nearest to the destination would be considered as the normal port. Plaintiff was so informed in hundreds of letters received from the GAO. Plaintiff's position in this case is, to a very large extent, based on GAO's use of the "closest port" concept.

We reject this interpretation of the pertinent contract provisions for several reasons. The above-quoted portion of Item 150 of MBT No. 1 is not phrased in terms of whether the port of debarkation is the port nearest to the final destination point of a diverted shipment. The evidence also shows that, while the relative proximity of possible ports of debarkation to the destination point is an important factor in the carrier's selection of the port to which a shipment is moved, the carrier also considers other matters in attempting to achieve the lowest cost in handling the shipment. Other considerations include the frequency of sailings and transit time to the port of debarkation, the cost of handling shipments to each port, and the practicability of consolidating a particular shipment with other shipments for land transportation.

There are hundreds of ports in the United States, including some which were rarely, if ever, used by plaintiff, and possibly others which could not be used for lack of necessary facilities. In oral argument, plaintiff's attorney conceded that the port closest to the inland destination point should not be utilized in every instance to determine the normal port, because Item 150 was intended to include ports that are regularly used to service the traffic.

The defendant first contends that Item 150 of MBT No. 1 should be read in conjunction with plaintiff's non-domestic service tender. We cannot agree with this view, because there was no definition in the service tender of the port or ports that would ordinarily be used. The tender merely listed certain stateside ports for shipments originating in various countries. In the letters mentioned above, the GAO pointed out that in the absence of a definition of the normal port of entry in the service tender, the port closest to the destination would be considered the normal port.

Moreover, the unrebutted evidence and our examination of plaintiff's service tender persuade us to find that the purpose of the tender was to describe the facilities and services which the carrier proposed to provide in order to qualify as a carrier of household goods for the Department of Defense. The tender did not purport to quote rates or to provide rules or formulae for the computation of freight charges. The carriers were not required to do so and many of them did not list stateside ports in the tenders.

Defendant next argues that if the service tender does not show the normal port for a particular shipment, the question is a factual one to be determined by reference to such sources as routing guides used by the carrier, the carrier's method of billing, and other external facts. Although a carrier's method of billing, consistently followed before a dispute arises, may be relevant in some circumstances, we think that plaintiff's billing practices on these shipments would be an unreliable guide for the resolution of an issue affecting so many carriers. The same is true of the routing used by a particular carrier.

The determination of the port ordinarily used on a shipment-by-shipment basis as a matter of fact, as the defendant proposes, contravenes the basic purpose of MBT No. 1. Its purpose was to assure uniformity in the assessment of charges under the military basic tender, especially accessorial charges such as the diversion charges in issue, so that the

only competitive variance among the carriers would be the single-factor transportation rates filed on electronic key-punch EAM cards (findings 9, 11, and 15). *See* also finding 17; Routed Thru-Pac, Inc. v. United States, 401 F. 2d 789, 185 Ct.Cl. 428 (1968). Thus, if the normal port should be ascertained on the basis of the varied billing practices followed by different billing clerks or the routing used by each carrier, the resulting diversion and other accessorial charges would vary from carrier to carrier and, from time to time, by the same carrier.

Since there was no definition of the normal port of entry in plaintiff's service tender or in MBT No. 1, we must look to other evidence to determine the meaning of the language that gave rise to this controversy. On September 15, 1966, the Household Goods Forwarders Association of America, Inc., acting for plaintiff and other carriers published Military Basic Tender No. 1–A, which cancelled MBT No. 1. It was a negotiated agreement and was accepted by the Department of Defense and became effective on October 1, 1966. In MBT 1–A, Item 150 was rewritten to provide that the normal port of entry was to be determined by reference to Appendix 1, a copy of which accompanies this opinion. The appendix provides as follows:

Appendix 1 indicates the Ports of Embarkation or Debarkation ordinarily used to service shipments moving between CONUS and each country indicated, and are to be considered as the basis upon which the various diversion charges in this item are computed. The ordinary port utilized on a shipment destined to CONUS will be determined by selecting the port which is closest to the final destination, to which the shipment is diverted. The ordinary port utilized for shipments with an oversea destination will be determined by selecting the port closest to the origin of the shipment. [Joint Exhibit No. 4].

The appendix contains a list of foreign countries arranged in ten separate groups. Opposite each group there are listed ports in the United States that are ordinarily used to service shipments moving between the continental United States and each of the countries named in that group.

We resort to these provisions of MBT 1–A in reliance on the rule that, in the absence of other evidence, courts may look to subsequent agreements and acts of the parties to determine their mutual construction of the language of a previously executed agreement. National Aircraft Maintenance Corp. v. United States, 171 F.Supp. 946, 145 Ct.Cl. 505, cert. denied, 361 U.S. 895, 80 S.Ct. 198, 4 L.Ed.2d 151 (1959); Victory Inv. Corp. v. Muskogee Elec. Traction Co., 150 F.2d 889, 893 (10th Cir.) cert. denied, 326 U.S. 774, 66 S.Ct. 232, 90 L. Ed. 467 (1945); Kinard v. Mutual Benefit Health & Acc. Ass'n, 108 F.Supp. 780, 789 (W.D.Ark.1952).

We hold, therefore, that Appendix 1 is a clarification, mutually adopted by the parties, of what was intended by the provisions of Item 150 of MBT No. 1 with respect to the ports "ordinarily" used during the period in issue here (January 17, 1963 through September 14, 1966). From the record as a whole, we conclude that this is not only a permissible construction of the language of Item 150 but that it is also a reasonable interpretation which conforms to the basic purpose for which MBT No. 1 was issued. "If a tariff is subject to different constructions, an interpretation which is reasonable and consistent with the purposes of the tariff should be preferred to a construction which is impractical or which leads to absurd consequences." National Van Lines, Inc. v. United States, 355 F.2d 326, 332 (7th Cir. 1966).

It follows from this construction of Item 150 of MBT No. 1 that the Port of New York was the normal port of entry for shipment No. 20, which was diverted to Rochester, New York, and that plaintiff's charges for the shipment should be computed on the basis of the single-fac-

tor rate applicable from the point of origin to destination, plus the diversion fee of $5.

On shipment No. 30, the Port of New York, the port of debarkation in this instance, was not the port normally utilized for shipments to Arcola, Illinois. Since Baltimore, Maryland, was the normal port of entry for the shipment, plaintiff is entitled to the line haul charges from Germany to New York at the single-factor rate and the diversion mileage charges from New York to Arcola, plus the flat $5 diversion charge.

### The "Port" Diversion Claims

█ These claims involve the issue of whether, when a shipment originating at an overseas point was taken by the plaintiff (or its agent) from the pier at the port of debarkation in the United States to the plaintiff's (or the agent's) warehoue which serviced the port for storage-in-transit pending the receipt of delivery instructions from the defendant, the shipment should be regarded as having left the port of debarkation in relation to a subsequent diversion order from the defendant.

Shipment No. 31 is illustrative of this issue. It was picked up in the Philippine Islands for transportation to Oakland, California. The bill of lading stated that storage-in-transit ("SIT") was authorized at the carrier's port facility for a period of not to exceed 90 days, and that the plaintiff was to "hold for disposition instructions." Upon the arrival of the shipment at the port of debarkation, it was removed from the pier by the plaintiff's agent and was stored in the agent's warehouse at Oakland, which serviced the port, for a period of 20 days pending the receipt of delivery instructions from the defendant. At the end of that time, and while the shipment was still in the Oakland warehouse, the defendant directed that the shipment be diverted to the Blytheville Air Force Base in Arkansas.

The question now presented for determination with respect to shipment 31 is whether the diversion to the Blytheville Air Force Base in Arkansas took place before or after the shipment left the "port of debarkation."

In connnection with this problem, the portion of Item 150 of MBT No. 1 that was applicable to a shipment diverted before it left the port of debarkation has been discussed in the preceding part of this opinion. The portion of Item 150 that was applicable to a shipment diverted after it left the port of debarkation provided in pertinent part as follows:

DIVERTED AFTER SHIPMENT HAS LEFT THE PORT OF DEBARKATION:

U.S. DESTINATION: If shipment is diverted to another point within the Continental United States, the point of diversion will be considered the destination point, and the single factor transportation rate to the point of diversion will apply. Further transportation will be considered a new shipment and the diversion rate of 50 cents net cwt. per 20 highway miles, or fraction thereof, will be assessed.
* * *

With respect to shipment 31, the plaintiff billed the defendant for charges based upon the single-factor rate from the point of origin in the Philippine Islands to the State of California, a diversion fee in the amount of $5, $35.38 for delivery into storage, $9.54 for storage and warehousing, and the diversion mileage rate from Oakland to the Blytheville Air Force Base, Arkansas. These charges, which were based by the plaintiff upon the theory that shipment 31 was diverted after it left the port of debarkation, were paid by the defendant without a prior audit.

Subsequently, the General Accounting Office audited the account and then collected from the plaintiff the sum of $413.01 as an alleged overcharge. The GAO's action was based on the conclusion that shipment 31 was diverted before it left the port of debarkation, and, therefore, that the single-factor rate from the point of origin in the Philip-

pine Islands to the State of Arkansas was applicable.[1] The plaintiff seeks to recover the $413.01 in the present action.

Boiled down, the question under consideration here with respect to shipment 31 is whether it left "the port of debarkation" when it was removed from the pier by the plaintiff's agent and was taken to the agent's warehouse which serviced the port for SIT while awaiting delivery instructions from the defendant. In this connection, the term "port of debarkation" is not defined in MBT No. 1. However, the word "port" is defined in the dictionary as follows:

> * * * a place where ships may ride secure from storms: HARBOR, HAVEN * * *[;] a harbor town or city where ships may take on or discharge cargo: the starting point or the destination of a voyage: a place to or from which goods may be shipped * * *[;] the entire geographical horbor area of a place * * *. [WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (Unabridged, 1968).]

It will be noted that none of the dictionary definitions of the word "port" justifies the narrow concept of the term "port of debarkation" for which the plaintiff contends in connection with the issue now under consideration—*i. e.*, that it means only the pier onto which a shipment is unloaded from a ship.

As previously indicated, the bill of lading—which constituted the contract between the plaintiff and the defendant with respect to the transportation of shipment 31—stated that "SIT not to exceed 90 days is auth at carrier's *port facility*" (emphasis supplied). Thus, the warehouse of the plaintiff (or its agent) which serviced the port of debarkation was characterized in the contract itself as a "port facility," i. e., as part of the port for the purpose of the contract between the parties. This was consistent with the dictionary definition of "port" as "a harbor town or city where ships may take on or discharge cargo," or as "the entire geographical harbor area of a place." Consequently, it appears that a warehouse operated by the plaintiff (or its agent) for the servicing of a port of debarkation was a port facility and part of the port for the purposes of Item 150 of MBT No. 1; and, accordingly, that shipment 31 did not leave the port of debarkation when it was taken from the pier to the warehouse.

Plaintiff is not entitled to any additional compensation on the ground that shipment No. 31 was diverted after it left the port of debarkation, and the petition should be dismissed to the extent that it claims any compensation on that ground.

### The Claims Based on "Diversions" to and from SIT

■ The issues presented by these claims are whether there was a diversion, within the meaning of Item 150 of MBT No. 1, when the plaintiff was instructed by the defendant to place a shipment in storage at the destination point while awaiting delivery instructions, instead of making delivery to the destination address shown on the bill of lading, and whether there was another diversion when the defendant subsequently directed that the shipment be delivered to the owner's new residence.

In connection with this problem, it should be mentioned that when a member of the Armed Forces is reassigned from a point within the United States to a point overseas, or vice versa, there is often some uncertainty at the time when his household goods are tendered to the carrier as to the exact location of his

---

1. There was implicit in the GAO's action a determination that the port of debarkation in California was the "normal port" for the servicing of the Blytheville Air Force Base, Arkansas, in connection with shipments moving to that point from the origin point in the Philippines of the diverted shipment. For a determination of this issue, see the discussion in this opinion under the heading, "The 'Normal Port' Diversion Claims."

new residence and the exact time when he will arrive at his new station. This is well understood by members of the household goods transportation industry. In such a situation, it is customary to consign the household goods to the owner at the military installation where he is expected to serve, to authorize storage-in-transit, and to instruct the carrier that, upon the arrival of the shipment at the railhead or port servicing the destination military post, the carrier shall notify the post transportation officer before delivering the goods or placing them in storage. If the uncertainty concerning the property owner's new residence and time of arrival has not been resolved when the shipment reaches the railhead or port servicing the destination military post, the post transportation officer directs the carrier to store the shipment while awaiting delivery instructions from the transportation officer or the owner of the household goods. This procedure is known as placing the shipment in "storage-in-transit" or in "SIT."

The warehouse for SIT is selected by the carrier, although it must be a facility which has previously been inspected and approved by the military officials.

The claims based upon alleged diversions to and from SIT are illustrated by shipment No. 4, which originated at a point in Rhode Island and was consigned to "Transportation Officer, Bldg. #4 Jager," the destination being given on the bill of lading as "Aschaffenburg, Germany." The bill of lading authorized storage-in-transit for not to exceed 90 days at destination and instructed the plaintiff to notify the transportation officer at Aschaffenburg upon the arrival of the goods and prior to placing them in storage.

Upon the arrival of the shipment at the railhead servicing Aschaffenburg, the plaintiff's agent notified the post transportation officer and was directed to place the shipment in storage-in-transit pending the receipt of delivery instructions. The SIT was accomplished by the plaintiff's agent in the agent's warehouse located at Darmstadt, Germany. Subsequently, the plaintiff's agent was directed to deliver the shipment to the property owner's new residence in Aschaffenburg, and this was done.

On shipment 4, the plaintiff billed the defendant for—and was paid without prior audit—the sum of $242.77, which included the line-haul transportation charge from the origin point in Rhode Island to Germany and, *inter alia,* a charge of $10.43 for delivery into storage.

In the present action, the plaintiff is endeavoring to recover under Item 150 of MBT No. 1:

(1) a $5 diversion charge and a diversion mileage charge in connection with the alleged diversion of the shipment from the bill-of-lading consignment address in Aschaffenburg to the SIT warehouse in Darmstadt; and

(2) a $5 diversion charge and a diversion mileage charge in connection with the alleged diversion of the shipment from the SIT warehouse to the property owner's new residence.

The term "diversion" was defined in Item 150 of MBT No. 1 as meaning—

* * * any change from original delivery instructions, including consignment or reconsignment of a destination point afrer commencement of transportation service, when authorized by appropriate government transportation officer * * *.

Item 150 further provided that "Upon receipt of diversion instructions and such is accomplished, a $5.00 Diversion Charge will apply in addition to the following provisions, rates and charges"; and this was followed by, *inter alia*, the portions of Item 150 relating to shipments diverted after arriving at, but prior to leaving, the port of debarkation, and shipments diverted after leaving the port of debarkation, as described in the two immediately preceding parts of this opinion.

Plaintiff's position is that the transportation contract is the bill of lading,

and the consignment address and destination marked on the bill of lading constitute the "original delivery instructions" mentioned in Item 150 of MBT No. 1. The language of that Item states that changes from "original delivery instructions" include "consignment or reconsignment of a destination point * * *." Therefore, argues plaintiff, when shipment No. 4, destined for Aschaffenburg and consigned to the transportation officer at Building No. 4 Jager, was ordered into SIT at Darmstadt, the shipment was reconsigned, the delivery instructions changed, and a diversion occurred. When the goods were later ordered out of SIT, to be delivered at the owner's residence in Aschaffenburg, plaintiff maintains that the goods were again reconsigned, once against changing the original delivery instructions and causing another diversion.

However, these contentions ignore both the factual context of the contract provisions and the bill of lading's authorization for storage-in-transit. The factual setting was always quite clear to both parties, i. e., that plaintiff contracted to make one pick-up, one delivery, and to furnish all the transportation in between. The parties recognized that delivery to a residence could not always be made immediately, because a property owner might not be located in his new residence when his goods arrived at the railhead or port servicing the destination. For this reason, the delivery instructions quite commonly did not specify immediate delivery to a residence, but instead authorized storage-in-transit in the event such storage was necessary. This was precisely the case in shipment No. 4. When the goods arrived in Aschaffenburg, they were ordered by defendant to be placed in SIT, and plaintiff chose his warehouse in Darmstadt as the storage area. Contrary to plaintiff's argument, however, the arrival of the goods at the railhead servicing Aschaffenburg was not a delivery. It was not until the goods were placed in SIT in Darmstadt that the plaintiff had made a "delivery" in accordance with and as authorized by the original delivery instructions on the bill of lading. See Routed Thru-Pac, Inc. v. United States, 401 F. 2d 789, 793, 185 Ct.Cl. 428, 435 (1968). The delivery to SIT was not a diversion, as plaintiff has urged, because it involved no change from the original delivery instructions. To the contrary, it was a fulfillment of a possibility contemplated by both parties and authorized by the bill of lading, which is the transportation contract.

Plaintiff's argument that orders to place the goods in SIT constituted a consignment or a reconsignment also lacks merit, because the destination point was originally, and never ceased to be, Aschaffenburg. The goods were never ordered to be delivered to Darmstadt. Rather, they were ordered to be placed in storage, and the plaintiff chose his warehouse in Darmstadt as the most convenient place. This, quite clearly, was not a consignment or a reconsignment within the meaning of Item 150. Similarly, when the goods were later transferred from SIT in Darmstadt to the owner's residence in Aschaffenburg, plaintiff performed not a diversion of the original delivery, but rather a second delivery. The second delivery was obviously contemplated by the original delivery instructions and was in fact ordered by additional delivery instructions, i. e., after the first delivery to SIT. The defendant concedes that the second delivery is compensable as an additional service under Item 145 of MBT No. 1.

Accordingly, the petition should be dismissed as to the plaintiff's claims for a $5 diversion charge and a diversion mileage charge in connection with the placement of shipment No. 4 in the warehouse of the plaintiff's agent for SIT, and for a $5 diversion charge and a diversion mileage charge in connection with the delivery of the shipment from the SIT warehouse to the property owner's new residence. Plaintiff is entitled to be paid under Item 145 of MBT No. 1 for the movement of the shipment from the SIT warehouse at the destination

point to the property owner's new residence.

## SIT Extensions

■ Another issue presented in this case is whether there was a diverson of a shipment, within the meaning of Item 150 of MBT No. 1, when the shipment was placed in storage-in-transit at the destination point while awaiting delivery instructions and the SIT period was subsequently extended beyond the period specified in the bill of lading.

Shipment No. 18 illustrates the issue outlined in the preceding paragraph. This shipment originated in Germany and was consigned to the property owner at Ft. Riley, Kansas. The bill of lading authorized SIT for not to exceed 90 days. Upon the arrival of the shipment, the transportation officer at Ft. Riley ordered that the shipment be placed in storage-in-transit, and this was accomplished by the plaintiff's agent in the agent's warehouse at Junction City, Kansas. After the shipment had been stored for 63 days in Junction City, the transportation officer at Ft. Riley ordered that the shipment be diverted to Ft. Sheridan, Illinois. Subsequently, the post transportation officer at Ft. Sheridan instructed the plaintiff's agent in that vicinity to place the shipment in SIT while awaiting delivery instructions; and the plaintiff's agent placed the shipment in the agent's warehouse at Des Plaines, Illinois. While the shipment was in the Des Plaines warehouse, the owner of the goods requested the transportation officer at Ft. Sheridan to extend the SIT time authorized for this shipment in the bill of lading by 90 days, due to the unavailability of quarters. This was done by the post transportation officer, and the plaintiff's agent was furnished a copy of the authorization. The shipment remained in SIT at Des Plaines for a total of 117 days. The plaintiff was paid the applicable storage charges under Item 140 of MBT No. 1, and there is no dispute in the present litigation with respect to such charges.

In the present case, the plaintiff claims, *inter alia*, that the action of the post transportation officer at Ft. Sheridan in extending the SIT period authorized in the bill of lading constituted a diversion of the shipment, and, accordingly, that the plaintiff is entitled to collect, in connection with such diversion, the $5 diverson charge authorized by Item 150.

In order to determine whether the extension of the SIT period was a diversion, we must look both to the provisions of Item 150 of MBT No. 1 and the Defense Supply Agency Regulations (finding 29) which were in effect at the time and define diversion or reconsignment. Since there was no change in the original delivery instructions, the extension is not compensable as a diversion under Item 150 alone. However, plaintiff contends that it is entitled to diversion charges pursuant to the provisions of Section XXA of the regulations, which define diversion to include, among other actions, the following:

5. Any other instructions given to the carrier that are necessary to effect delivery and require a change in billing and /or an additional movement of the vehicle.

We reject plaintiff's contention and hold that there was no diversion within the meaning of the regulations with respect to the additional storage time for shipment No. 18. The instructions were not necessary to effect delivery of the shipment and there was no additional movement of the vehicle used by plaintiff for transporting the shipment.

The petition should, therefore, be dismissed as to plaintiff's claim for a $5 diversion charge in connection with the extension of the SIT period authorized in the bill of lading covering shipment No. 18.

## Movement of Shipments into and out of SIT

■ Another issue presented in this case is whether, when a shipment was placed in storage-in-transit at the desti-

nation point while awaiting delivery, instructions and was thereafter delivered to the new residence of the property owner pursuant to delivery instructions, the carrier is entitled under Item 145 of MBT No. 1 to compensation both for performing the movement into SIT and for performing the movement out of SIT.

This issue is illustrated by shipment No. 27, which originated in Germany and was consigned to the property owner at Lawton, Oklahoma. The bill of lading authorized storage-in-transit at destination for not to exceed 90 days. When the shipment arrived at Lawton, the transportation officer at Fort Sill directed the plaintiff's agent to place the shipment in SIT, and this was accomplished in the agent's warehouse at Lawton. The transportation officer subsequently ordered the shipment removed from SIT and delivered to the property owner at a specified street address in Lawton.

On shipment No. 27, the plaintiff billed the defendant, and was paid, the sum of $24.86 under Item 145 of MBT No. 1 for the movement into SIT, and also for $24.86 under Item 145 for the movement out of SIT. The General Accounting Office issued a notice of overcharge which requested the refund of the compensation that had been paid for the movement into SIT. The plaintiff complied with that request and refunded $24.86 to the defendant. (The charge of $24.86 for the movement of the shipment out of SIT was not involved in the notice of overcharge, and the defendant concedes that it was properly collected.)

In the present action, the plaintiff seeks, *inter alia,* to collect a charge under Item 145 for the movement of shipment 27 into SIT.

Item 145 of MBT No. 1 prescribed "Pick-Up or Delivery Transportation Rates To Apply on Storage-in-Transit Shipments." It was in Section II of MBT No. 1, which was entitled "Additional Services," and stated that the rates and charges prescribed in the section for "additional services" were "in addition to" the single-factor transportation rates filed by carriers.

This same issue has previously been before the Court of Claims in the case of Routed Thru-Pac, Inc. v. United States, 401 F.2d 789, 185 Ct.Cl. 428 (1968). In that case, the court said 401 F.2d at p. 793, (185 Ct.Cl. at p. 435) that "the single-factor rate necessarily incudes one 'pick-up' and one 'delivery' and all the land and water transportation in between;" and that "[i]tem 145 provides additional compensation only for 'additional' or 'accessorial' services rendered above and beyond what is required by the single-factor rate." The court subsequently said 401 F.2d at p. 793, 185 Ct.Cl. at pp. 435–436):

> * * * Where storage-in-transit occurs at destination, there is an additional "delivery", but not an additional pick-up, i. e., the goods are delivered once to the warehouse and then delivered after storage to the destination residence. The first of the deliveries is compensated by the single-factor rate, since the single-factor rate necessarily includes one "delivery". The second delivery is paid pursuant to Item 145 as additional compensation.
>
> * * *

The court's decision in *Routed Thru-Pac* clearly requires the rejection of the plaintiff's claim for compensation in connection with the movement of shipment 27 into SIT.

Therefore, the petition should be dismissed as to the plaintiff's claim under Item 145 of MBT No. 1 in connection with the movement of shipment No. 27 into SIT.

### The "Diversion Without SIT" Claims

Another issue presented in this case is whether, when a shipment arrived at the destination point and the carrier was directed to deliver the shipment, without SIT, to the property owner at a residence address not shown on the bill of lading, there was a diversion

of the shipment, within the meaning of Item 150 of MBT No. 1.

This issue is illustrated by shipment No. 33, which originated in Guam and was consigned to the property owner at "Beeville, Texas (NAAS) [Naval Air Auxiliary Station]." Storage-in-transit for not to exceed 90 days was authorized. The plaintiff was instructed to notify the transportation officer at the Naval Air Station in Corpus Christi, Texas, upon the arrival of the shipment. When shipment 33 arrived at Beeville, the plaintiff's agent notified the transportation officer at the Naval Air Station in Corpus Christi, and was instructed to deliver the shipment to the property owner at 173 Ann Burke Apartments in Beeville.

The plaintiff was paid on October 25, 1963 for the transportation of shipment 33 on the basis of the single-factor rate from the origin point in Guam to the State of Texas. In the first amendment to the petition, which was filed on February 16, 1967, the plaintiff seeks to collect under Item 150 of MBT No. 1 a $5 diversion charge and a diversion mileage charge in the amount of $6.56, on the ground that there allegedly was a diversion of the shipment from the Naval Air Auxiliary Station in Beeville to 173 Ann Burke Apartments in Beeville.

Item 150, like Item 145, is in Section II of MBT No. 1. As stated in the immediately preceding part of this opinion, Section II was entitled "Additional Services" and stated that the rates and charges prescribed in the section for "additional services" were "in addition to" the single-factor rates filed by carriers. Item 150 prescribed rates and charges for additional services which carriers were required to perform as a result of diversions ordered by transportation officers; and the term "diversion" was defined as meaning "any change from original delivery instructions."

Therefore, in connection with the claim now under consideration, the problem is whether, as a result of a "change from original delivery instructions" or-

dered by a transportation officer, the plaintiff was required to perform an additional service which it was not obligated to perform as part of the consideration for the line-haul transportation charge previously collected from the defendant.

At the time when shipment 33 was tendered to and accepted by the plaintiff in Guam, it was known that the property owner was being transferred to the Naval Air Auxiliary Station in Beeville, Texas, but there was uncertainty concerning the exact location of the property owner's destination residence, where the plaintiff would ultimately make delivery and unpack the household goods. Consequently, the plaintiff was instructed to notify the transportation officer at the Naval Air Station in Corpus Christi, Texas, upon the arrival of the shipment at Beeville, the clear implication being that the transportation officer would either give the plaintiff specific delivery instructions at that time or else direct the plaintiff to place the shipment in SIT pending the issuance and receipt of delivery instructions.

Therefore, when the plaintiff's agent, upon notifying the transportation officer relative to the arrival of the shipment at Beeville and receiving delivery instructions, delivered the shipment to the property owner's residence at 173 Ann Burke Apartments in Beeville, the plaintiff's agent was merely performing a service which the plaintiff had contracted to perform on the basis of its single-factor transportation rate, and was not performing an "additional" service. The single-factor transportation rate covered one delivery, and this was accomplished when shipment 33 was delivered to the property owner's new residence in Beeville, without SIT.

Furthermore, there was not involved in connection with shipment 33 "any change from original delivery instructions." As previously indicated, the bill of lading itself did not give instructions concerning the delivery of the shipment to the serviceman's destination residence, since the exact location of the

destination residence was unknown at the time when the bill of lading was issued. Instead, the bill of lading notified the plaintiff that it would receive specific delivery instructions from the transportation officer at the Naval Air Station in Corpus Christi when the latter was informed regarding the arrival of the shipment at Beeville. Thus, the instructions from the transportation officer to the effect that the shipment was to be delivered to the property owner at 173 Ann Burke Apartments in Beeville were the "original delivery instructions" contemplated by the parties.

The conclusion that there was no diversion of shipment 33, within the meaning of Item 150 of MBT No. 1, when the shipment arrived at the destination point and the carrier was directed to deliver the shipment, without SIT, to the property owner at his new residence address, makes it unnecessary to consider the question of whether the 3-year limitation period prescribed in 49 U.S.C. § 1006a or the 6-year limitation period prescribed in 28 U.S.C. § 2501 is applicable to this claim.

The petition should be dismissed as to the plaintiff's claim under Item 150 of MBT No. 1 for a $5 diversion charge and a $6.56 diversion mileage charge in connection with the delivery of shipment No. 33 to the property owner's new residence, without SIT.

### Shipments Packed at Non-Temporary Storage Origins

■ Another issue presented in this case is whether, when a shipment was in non-temporary storage at the origin point and the evidence indicates that the carrier packed some of the household goods prior to transporting them, the carrier is entitled to be compensated for the transportation on the basis of the full single-factor rate from origin to destination without showing either that no preliminary packing of such household goods was performed prior to storage or, in the alternative that the repacking of such household goods was directed by a transportation officer.

This issue is illustrated by shipment No. 1, which was picked up by the plaintiff at a warehouse in Columbus, Georgia, where it was in non-temporary storage. The shipment was to be transported by the plaintiff to Bamberg, Germany. The documentary evidence in the record indicates that 2 barrels and 13 cartons in the shipment were packed by the plaintiff prior to the transportation of the shipment from Georgia to Germany.

The plaintiff billed the defendant for, and was paid, $452.16 to cover the line-haul move from the origin point in Georgia to Germany, based on the single-factor rate of $31.40 per hundredweight. The defendant subsequently issued a notice of overcharge demanding a refund of $21.60 from the plaintiff, on the ground that the single-factor rate should be reduced by $1.50 per hundredweight in accordance with Item 25A of MBT No. 1. The plaintiff refunded the $21.60 under protest, and seeks to recover that amount in the present action.

As previously indicated in this opinion, one of the services which the plaintiff was generally obligated to perform under its single-factor transportation rate was the packing of the serviceman's household goods at his origin residence. In this connection, however, Item 25A of MBT No. 1 provided as follows:

Any shipment originated at a storage warehouse, and for which preliminary packing was performed prior to storage, will not be repacked unless directed by the transportation officer to insure safe transportation to destination. When packaging is not required, the applicable single factor rate named will be reduced by $1.50 per net cwt.

The problem here is to determine the proper rate for the line-haul transportation of shipment 1 from the origin point in Georgia to Germany. The plaintiff's claim is based on the contention that the proper rate is the full single-factor rate of $31.40 per hundredweight, without any reduction. The defendant, on the other hand, contends that the proper rate is the single-factor

rate less $1.50 per hundredweight under Item 25A of MBT No. 1.

█ With respect to this claim—as with respect to all other claims asserted in the petition—the plaintiff has the burden of proof.[2]

Since the evidence showed that shipment 1 originated at a storage warehouse, the plaintiff had the burden of establishing that Item 25A of MBT No. 1 was inapplicable; and in order to do this, the plaintiff was required to prove either that no preliminary packing prior to storage was performed and the household goods which the plaintiff packed in 2 barrels and 13 cartons, or, in the alternative, that the plaintiff was directed by a transportation officer to repack such goods prior to transporting them to Germany. No evidence on either of these points was presented by the plaintiff. The documentary evidence which merely showed that the plaintiff packed 2 barrels and 13 cartons of shipment 1 prior to transporting the shipment from Georgia to Germany was not sufficient to establish the inapplicability of Item 25A of MBT No. 1.

Therefore, the plaintiff has not sustained its burden of proof; and its claim for the recovery of $21.60 in connection with shipment 1 must be denied.

The petition should be dismissed as to the plaintiff's claim based on the full single-factor transportation rate, without reduction, in connection with the movement of shipment No. 1 from the origin point in Georgia to the destination point in Germany.

*Loss of Containers*

█ Another issue presented in the present case is whether a carrier is entitled to compensation on a quantum valebat basis for the loss of its containers when a shipment was being transported in carrier-owned containers and the defendant ordered that such shipment be delivered in the carrier-owned containers for non-temporary storage at a warehouse operated by a company other than the carrier or its agent,[3] or the defendant ordered that the shipment be delivered to another carrier for further transportation in the first carrier's containers, with the result that the first carrier lost possession of its containers and never recovered them.

This issue is illustrated by shipment No. 7, which originated in Okinawa and was consigned to the transportation officer at the Oakland Army Terminal in California. At the origin residence of the property owner in Okinawa, the household goods were packed in three containers belonging to the plaintiff: one 220-cubic-foot container, one 153-cubic-foot container, and one 21-cubic-foot container. The bill of lading directed that the shipment be held "for disposition." Upon the arrival of the shipment at the port of debarkation the defendant directed that it be placed in storage-in-transit, and this was accomplished at the warehouse of the plaintiff's agent in Oakland, California. After the shipment had been in SIT for 31 days, the defendant instructed that the shipment, which was still in the plaintiff's containers, be delivered to a warehouse in San Francisco for non-temporary storage, the San Francisco warehouse being operated by a company with which the plaintiff had no agency or other relationship. When this occurred, the plaintiff lost possession of its con-

---

2. Contrary to a statement in the plaintiff's brief, this is not a situation where the defendant is asserting an offset against the plaintiff's transportation claim and, therefore, has the burden of proof with respect to the offset. The controversy revolves around the determination of the proper transportation rate, as to which the plaintiff has the burden of proof.

3. The record contains evidence concerning instances where shipments in carrier-owned containers were delivered to warehouses operated by agents of the plaintiff for non-temporary storage. Since no findings of fact concerning losses of containers in such instances were requested by the plaintiff, claims for any losses of containers in those situations are regarded as waived by the plaintiff.

tainers. The plaintiff did not thereafter recover the containers.

The plaintiff billed the defendant for the alleged value of the containers used in connection with shipment 7, *i. e.*, $25 for the small container and $50 each for the two larger containers, or a total of $125. This charge was not paid by the defendant; and the plaintiff seeks in the present action to recover the sum of $125 for the loss of its containers.

When household goods are tendered to a carrier for transportation in accordance with the door-to-door container service under MBT No. 1, the household goods are packed by the carrier at the origin residence of the property owner and are loaded into specially designed containers belonging to the carrier. At the destination residence, the household goods are unpacked from the containers, and the containers, together with the necessary packing materials, are retained by the carrier. At the time involved in the present litigation, there was no provision in the defendant's regulations which permitted a carrier to remove the household goods from the containers prior to delivery to the destination residence, unless such removal was expressly authorized by a military transportation officer.

There was an implied contractual obligation on the part of the defendant to permit a carrier to retain its containers upon the completion of the transportation service which the carrier was obliged to perform under the contract between the parties. The defendant failed to discharge its implied contractual obligation in this respect when the defendant directed the carrier to deliver a shipment, while still in the carrier's containers, for non-temporary storage in a warehouse operated by a company with which the carrier had no agency or other relationship.

Non-temporary storage is permanent storage, and is to be contrasted with storage-in-transit, which is temporary storage performed during the course of the transportation of a shipment. Non-

temporary storage was not performed under the terms of MBT No. 1, but under a separate contract between the defendant and the operator of the warehouse.

The defense interposed by the defendant in connection with the claim for the loss of the containers used for shipment 7, and other similar claims, is that the plaintiff at the trial did not introduce sufficient evidence regarding the value of the lost containers.

The evidence in the record shows that the acquisition cost of the type of container used by the plaintiff ranged between $30 and $40. With respect to the containers that were actually used in connection with shipment 7 and the other shipments that raise the issue now under consideration, there is no evidence in the record concerning the age of the containers, the extent to which they had been used prior to the particular shipments that are involved in the present litigation, or their condition at the time when the plaintiff lost possession of them due to the directives issued by the defendant.

On the other hand, it is certainly proper to infer from the evidence in the record that the plaintiff's containers were capable of being used for the transportation of household goods and, accordingly, that they had some value at the time of their loss. This is sufficient for present purposes, since the initial trial of the case was held on the issue of liability only, with the amount of the plaintiff's recovery (if any) being reserved for subsequent proceedings under Rule 131(c).

Judgment on the question of liability should be entered for the plaintiff on its claim for the loss of the containers used in connection with shipment No. 7.

*Additional Transportation Performed on Mode 5 Shipments*

 Another issue presented in this case is whether, when an MSTS vessel carried a door-to-door container-Government, or Mode 5, shipment before the

fall of 1965 to a port of debarkation other than the MSTS port that was nearest to the destination point of the shipment, the carrier is entitled to compensation on a *quantum meruit* basis for the additional land transportation which it was required to perform as a result of the defendant's failure to use the MSTS port nearest to the destination point.

This issue is illustrated by shipment No. 8, a Mode 5 shipment which originated in the Canal Zone and was consigned to the property owner in Benton, Pennsylvania. The shipment moved to the continental United States from the Canal Zone aboard an MSTS vessel which was bound for the Port of New York. The shipment was picked up by the plaintiff at a pier in Newark and was transported to Benton, a distance of 176 miles.

Philadelphia is an MSTS port of call, and it is located 131 miles from Benton.

The plaintiff billed the defendant, and was paid, $94.50 for the transportation of shipment 8, based on the plaintiff's single-factor rate of $18.90 per hundredweight that was applicable to Mode 5 shipments moving from the Canal Zone to points in Pennsylvania. This payment is not in dispute.

In the present action, the plaintiff seeks to recover $6.75 for the additional land distance of 45 miles over which the plaintiff was required to transport shipment 8 because the defendant did not use Philadelphia as the port of debarkation. This amount is computed by utilizing as the measure of compensation the mileage rate prescribed in Item 150 of MBT No. 1.

As of the time when shipment 8 moved from the Canal Zone to Benton, the evidence in the record does not reveal any contractual provision or any understanding[4] pursuant to which the defendant, in connection with a Mode 5 shipment, agreed to utilize as the port of debarkation the MSTS port nearest to the destination point.

The evidence in the record indicates that the plaintiff held itself out to the defendant as ready, willing, and able to accept Mode 5 shipments moving from the Canal Zone to points in the continental United States through the MSTS ports of New York, Norfolk, and New Orleans. As shipment 8 moved through the Port of New York, the plaintiff did no more than what it had contracted to do when it transported the shipment from the port of debarkation to the destination point given in the bill of lading. Hence, there is no proper basis for an additional recovery on the the theory of *quantum meruit*.

The petition should be dismissed as to the plaintiff's claim based on a charge for additional land transportation in connection with shipment No. 8.

*Additional Transportation Performed as Result of Maritime Strike*

Another issue presented in this case is whether a carrier is entitled to extra compensation on a *quantum meruit* basis when the defendant, because of the existence of a maritime strike at the port of embarkation closest to the origin of the shipment, requested the carrier to transport the shipment to a more distant port for loading aboard a vessel there.

This issue is illustrated by shipment No. 34, which originated in Quitman, Georgia, and was consigned to the property owner in Bamberg, Germany. The nearest port of embarkation for shipments originating in Quitman, Georgia, and bound for Germany is Jacksonville, Florida, which is 136 miles from Quitman. The Port of Jacksonville was strikebound at the time when shipment 34 was tendered to and accepted by the plaintiff. The plaintiff at first held the shipment at the origin point while awaiting the resolution of the maritime strike at Jacksonville. However, the transportation officer at the origin point requested the plaintiff to expedite the shipment and to transport it to the Army Terminal at New Orleans, Louisi-

---

4. See finding 78 relative to an understanding that was reached in the fall of 1965.

ana, so that the Army Terminal could arrange for MSTS to perform the ocean transportation. New Orleans is 481 miles from Quitman, Georgia. The plaintiff complied with the transportation officer's request and sent shipment 34 to the plaintiff's agent in New Orleans, thereby providing land transportation over a distance that was 345 miles greater than the distance between the origin point and the Port of Jacksonville. At New Orleans, shipment 34 was ultimately loaded aboard a commercial vessel, rather than an MSTS vessel, for the ocean transportation to Germany.

The plaintiff was paid $224.64 under the plaintiff's single-factor rate for the line-haul transportation from Quitman, Georgia, to Germany. In the present action, the plaintiff seeks, *inter alia*, additional compensation on a *quantum meruit* basis in the amount of $82 for the 345 additional miles of land transportation necessitated by the defendant's request that New Orleans be used as the port of embarkation. The plaintiff computes the charge of $82 by utilizing, as the measure of compensation, the mileage rate prescribed in Item 150 of MBT No. 1.

Under MBT No. 1, a carrier transporting a shipment in the door-to-door container mode was entitled to select the entire routing for the shipment, including the port of embarkation, and this was normally done on the basis which would achieve the lowest overall cost in handling the shipment. The plaintiff's prerogative in this respect was violated by the defendant as to shipment 34 when the defendant requested the plaintiff to expedite the shipment by utilizing the distant Port of New Orleans as the port of embarkation.

The performance by the plaintiff at the defendant's request of this additional land transportation created an implied obligation on the part of the defendant to reimburse the plaintiff for the reasonable value of the extra service. The mileage rate prescribed in Item 150 of MBT No. 1 would seem to be, as asserted by the plaintiff, a reasonable standard to use in evaluating the extra service.[5]

The defendant refers to Army Regulations No. 55–33, which prescribed rather elaborate procedures for the handling of through-bill-of lading shipments of household goods during periods of maritime strikes, and to a communication which the plaintiff addressed to all military transportation officers on January 18, 1965, stating that the plaintiff "hereby agrees to handle all shipments tendered that normally flow through an East or Gulf Coast Port of the U.S. in accordance with the recently published AR 55–33 Regulations." However, the defendant in its brief does not call attention to any specific provision of AR 55–33 which purported to require that carriers perform extra services, without additional compensation, in complying with the emergency procedures designed to cope with conditions resulting from maritime strikes.

The defendant asserts, as an affirmative defense, that since the plaintiff billed the defendant, and was paid, a line-haul charge for the transportation of shipment 34 from origin to destination based on the plaintiff's single-factor rate, the plaintiff is estopped from asserting in the present litigation a claim for a further charge based on the additional land transportation involved in complying with the defendant's request that New Orleans be used as the port of embarkation. The evidence in the record shows that the submission by the plaintiff of supplemental billings in connection with shipments of household goods moving under MBT No. 1 was a common practice; that the defendant paid such supplemental billings when they were regarded as meritorious; and that the defendant never objected to the practice, although the defendant did request the plaintiff, when the volume of

---

5. Payment for the extra service is neither authorized nor precluded by Item 150 of MBT No. 1. Therefore, plaintiff's claim is on a *quantum meruit* basis.

supplemental billings under MBT No. 1 became so great that the General Accounting Office could not cope with the paperwork, to "cease and desist" until the disputed issues concerning the interpretation of MBT No. 1 could be resolved. It does not appear that the doctrine of estoppel should prevent a recovery by the plaintiff on the claim now under consideration. Except for extra work, no detriment to the defendant arising from the plaintiff's failure to include this item in its original billing relative to shipment 34 has been shown.

Judgment should be entered for the plaintiff on the issue of liability with respect to the claim for extra compensation based upon the additional land transportation involved in the movement of shipment No. 34 from the origin point to a more distant port of embarkation pursuant to the defendant's request.

The same principle would permit recovery by the plaintiff of extra compensation on a *quantum meruit* basis in connection with the performance of additional land transportation from the port of debarkation to the destination point in a situation where the plaintiff's normal routing procedure was frustrated by the defendant, with the result that the port of debarkation actually used was more distant from the destination point than the port ordinarily used in connection with shipments moving from the origin point to the destination point.

### Transfer of Shipment Between Piers

 Another issue presented in this case is whether a shipment was diverted, within the meaning of Item 150 of MBT No. 1, when the defendant directed that it be transferred from one pier in the port of embarkation to another pier in the same port for loading aboard a vessel.

This issue is illustrated by shipment No. 36, which was tendered to the plaintiff in Denver, Colorado, and was consigned to the property owner in Verdun, France. The plaintiff transported the shipment, consisting of two containers, to New Orleans, Louisiana, where the plaintiff was able to place one container on board a commercial vessel of the Waterman Steamship Corporation for the ocean transportation to France. Due to a maritime strike, the defendant directed the plaintiff to move the second container from the commercial pier of the Waterman Steamship Corporation in New Orleans to the MSTS pier in New Orleans, where the second container was placed on board an MSTS vessel for the ocean transportation to France.

The plaintiff billed the defendant, and was paid, for the line-haul transportation of shipment No. 36 from Denver, Colorado, to France. In the present litigation, the plaintiff seeks additional compensation for the transportation performed in moving the second container from the commercial pier in New Orleans to the MSTS pier at defendant's direction. Plaintiff claims $69.92, the minimum mileage diversion charge under Item 150 of MBT No. 1, plus the flat $5 diversion charge also provided for in Item 150.

On shipment No. 36, plaintiff also seeks compensation in the amount of $205.43 for the 105 miles of additional land transportation which plaintiff performed in moving the second container from the MSTS port of discharge in St. Nazaire to Verdun. Plaintiff's right to recover for such additional land transportation is covered by the preceding section of this opinion under the heading, "*Additional Transportation Performed as Result of Maritime Strike.*"

Plaintiff's argument with respect to the transfer between piers is based on the provisions of Item 150 of MBT No. 1 and Paragraph XX of defendant's Defense Supply Agency Regulation (DSAR) 4500.1.

Item 150 defines diversion as "any change from original delivery instructions, including consignment or reconsignment of a destination point after commencement of transportation service * * *." The regulations (finding 29), which were in effect at all times relevant to this case, supplemented the definition of diversion, and Paragraph XXA

thereof states that the following actions constitute a diversion:

 5. Any other instructions given to the carrier that are necessary to effect delivery and require a change in billing and/or an additional movement of the vehicle.

It seems clear to us that defendant's instructions to plaintiff to move one of the containers from the commercial pier to the MSTS pier in New Orleans were instructions that were necessary in order to effect delivery of the container as a result of the Maritime strike and that these instructions also required an additional movement of plaintiff's vehicle between the two piers. Therefore, under the terms of the regulation, the defendant's instructions and the additional services performed by plaintiff constituted a diversion for which plaintiff is entitled to compensation under the provisions of Item 150 of MBT No. 1. Judgment should be entered for plaintiff to that effect on the issue of defendant's liability on this claim.

*Warehouse Handling Performed in a Government Warehouse*

■ Another issue presented in this case is whether a carrier is entitled to compensation, either under Item 140 of MBT No. 1 or on a *quantum meruit* basis, in a situation where the defendant ordered a shipment placed in storage-in-transit at a Government-owned warehouse and the carrier performed the necessary warehouse handling involved in the placement and subsequent removal of the shipment.

This issue is illustrated by shipment No. 38, which was picked up by the plaintiff at Ft. Leavenworth, Kansas, and was consigned to the property owner at Ft. Kobbe in the Canal Zone. Upon the arrival of the shipment in the Canal Zone, it was placed in storage-in-transit at a Government-owned storage facility pursuant to a directive from the defendant. After a 275-day period of storage, the shipment was delivered to the property owner's destination residence at Ft. Kobbe. The necessary handling of the shipment into and out of the Government-owned warehouse was performed by the plaintiff's agent.

The plaintiff billed the defendant, and was paid, $610.50 for the line-haul transportation of shipment 38 from Ft. Leavenworth, Kansas, to the Canal Zone, and $16.50 for the delivery of the shipment to the storage facility. There is no dispute between the parties regarding these charges.

In the present action, the plaintiff is seeking, *inter alia*, to recover a warehouse handling charge in connection with shipment 38.

Warehouse handling is the service of moving a shipment from the platform at the entrance of a storage warehouse to the position within the warehouse where the shipment will remain during storage-in-transit, the necessary record keeping, and the reverse movement out to the platform when the shipment is removed from storage-in-transit. Warehouse handling is always performed when a shipment is placed in storage-in-transit.

Item 140 of MBT No. 1 was entitled "Storage-in-Transit and Warehouse Handling Charges." It prescribed in two parallel columns the rates that were to be used in computing charges for the "storage" and for the "warehouse handling" of shipments which were placed in storage-in-transit.

The defendant argues that since Item 140 prescribed rates both for the storage and for the warehouse handling of shipments placed in storage-in-transit, it was intended to apply only in situations where shipments were placed in SIT at commercial facilities, since no storage charge would ever be involved with respect to a shipment placed in SIT at a Government-owned facility. From this premise, the defendant proceeds to the conclusion that a carrier was required to perform without charge the necessary warehouse handling in connection with any shipment placed in SIT at a Govern-

ment-owned warehouse pursuant to the defendant's directive.

The result contended for by the defendant does not commend itself for fairness. The same sort of warehouse handling by the carrier (or its agent) was required in connection with a shipment moving into and out of SIT at a Government-owned warehouse as was required in connection with a shipment moving into and out of SIT at a commercial warehouse. From the standpoint of fundamental fairness, it is difficult to understand why a carrier should be entitled to a warehouse handling charge under Item 140 for the performance of this necessary service in the second situation but should be denied such a charge in the first situation.

Furthermore, from the standpoint of the logical interpretation of Item 140, it does not follow that merely because a carrier could not collect a storage charge under Item 140 when a shipment was placed in SIT at a Government-owned facility (the carrier having furnished no storage service), the carrier must also be foreclosed from collecting the warehouse handling charge provided for in Item 140, even though the carrier performed the warehouse handling service contemplated by Item 140.

It appears that Item 140 of MBT No. 1 should be construed as covering warehouse handling by a carrier at a Government-owned warehouse, as well as warehouse handling at a commercial warehouse.

Therefore, judgment should be entered for the plaintiff on the issue of liability with respect to the plaintiff's claim for a warehouse handling charge in connection with shipment No. 38.

### Transportation Performed After Lengthy SIT in Government Warehouse

 Another issue presented in the present case is whether the extension of the SIT period in a Government-owned warehouse at destination beyond 180 days terminated the original transportation contract between the carrier and the defendant, so that the subsequent transportation of the shipment by the carrier from the SIT warehouse to the property owner's destination residence was under a new implied contract.

This issue is illustrated by shipment No. 38, which was discussed in the immediately preceding part of this opinion. It has been previously mentioned that upon the arrival of this shipment in the Canal Zone, the defendant directed that it be placed in storage-in-transit at a Government-owned warehouse. The SIT continued for 275 days. At the end of the SIT period, the defendant directed that the shipment be delivered to the property owner at his destination residence within the military installation mentioned in the bill of lading as the consignment point; and this was done by the plaintiff's agent.

The plaintiff has previously been paid a line-haul transportation charge on the basis of its single-factor rate, and has also been paid a charge for the delivery of the shipment to the Government warehouse for SIT.

In the present action, the plaintiff claims, *inter alia*, that it is entitled to compensation, on the basis of its commercial transportation rate applicable between overseas points, for the movement of shipment 38 from the SIT warehouse to the property owner at his destination address. It seems to be the plaintiff's theory that the retention of shipment 38 in the SIT warehouse for 275 days automatically terminated the plaintiff's obligation under the original transportation contract.

The plaintiff relies on Item 45 of MBT No. 1, which was entitled "Storage-in-Transit Period" and which provided that "Storage-in-transit service provided in this tender will be for a period of 180 days." The plaintiff says in its brief that when shipment 38 remained in the SIT warehouse longer than the 180-day period provided for in Item 45, "the original transportation contract expired on termination of the 180-day storage period and the subse-

quent transportation from the warehouse and all services performed thereafter at defendant's request was [*sic*] not performed under MBT No. 1, * * * but were performed at plaintiff's commercial rates otherwise applicable."

It is readily apparent from the language of Item 45 of MBT No. 1 that it related to—and only to—SIT service furnished by a carrier pursuant to the tender. In connection with shipment 38, the SIT service was not furnished by the plaintiff (or its agent), but by the defendant. Therefore, the 180-day limitation prescribed in Item 45 for carrier-furnished SIT was not applicable to the transaction now under consideration.

The matter of the delivery of SIT shipments from Government-owned facilities outside the continental United States was governed by Item 135 of MBT No. 1. That item provided (among other things) that when a shipment was placed in SIT at destination in a Government-owned facility, the "carrier will perform delivery and unpacking service within a 50 mile radius * * * of the point of storage without additional charge." Item 135 did not place any limit on the length of time that a shipment might be held in SIT at a Government-owned facility.

Therefore, the retention of shipment 38 in the Government-owned warehouse at destination for a period longer than 180 days did not, as contended by the plaintiff, terminate the original transportation contract between the plaintiff and the defendant. Accordingly, the delivery of the shipment from the Government-owned warehouse to the property owner's destination residence was governed by Item 135 of MBT No. 1.

The petition should be dismissed as to the plaintiff's claim, based upon its commercial transportation rate applicable between overseas points, for the movement of shipment 38 from the Government-owned warehouse to the property owner's destination residence.

### Shipments Diverted Out of SIT

One of the issues also presented in this case is whether, when diversion instructions are received while a shipment is in storage-in-transit, the charges for delivery to destination from the storage point will be as provided in Item 145 of MBT No. 1 or as specified in Item 150.

The shipments involved in this issue are the following:

Shipment No. 6 dated December 6, 1963, diverted from New York to Columbus, Georgia;

Shipment No. 12 dated November 20, 1963, diverted from New York to Picher, Oklahoma;

Shipment No. 13 dated February 24, 1964, diverted from Oakland, California, to Montebello, California;

Shipment No. 15 dated June 12, 1964, diverted from New York to Tinker Air Force Base, Oklahoma;

Shipment No. 18 dated October 3, 1963, diverted from Fort Riley, Kansas, to Fort Sheridan, Illinois;

Shipment No. 31 dated June 21, 1963, diverted from Oakland, California to Blytheville, Arkansas.

Shipment No. 6 is typical of the shipments which present this question. It originated in Germany and was consigned to "SFC, Charles E. McCormick * * * Port Trans. Officer, Army Terminal Command, Brooklyn, New York * * *." After arrival of the shipment in Brooklyn, the defendant ordered the goods placed in SIT. Plaintiff accordingly placed the shipment in its agent's warehouse in Kearny, New Jersey. Subsequently, defendant directed plaintiff to deliver the shipment to the property owner's new residence at 4413 Sims Street, Columbus, Georgia, instead of to the original destination in the Brooklyn area.

Plaintiff billed and was paid $632.40 for the line-haul transportation charge from Germany to New York, plus diversion charges under Item 150 of $266.24 as diversion mileage from New York to

Columbus, plus the $5 flat diversion fee. For the same shipment, plaintiff billed and was paid $52.70 under Item 145 for the movement into SIT at Kearny. Plaintiff also submitted a bill for but was not paid $537.54 under Item 145 for the movement from SIT to Columbus, Georgia.

Plaintiff's position is that it is entitled to compensation for the movement from Brooklyn to the SIT site, either under Item 145, or under Item 150 as a diversion. Plaintiff also maintains that since Item 150 does not cover shipments diverted to a new destination after storage-in-transit, all such movements are compensable under Item 145.

Defendant's position is that neither the movement into SIT, nor the delivery out of SIT, once there is diversion, can be compensable under Item 145. Defendant asserts that the payment of $52.70 for the movement into SIT was in error; that the movement out of SIT was a diversion, was paid for as such under Item 150, and that the total diversion charges should be no greater than the $271.24 already paid.

Plaintiff's claim that it should be compensated for the movement into SIT under Item 150 has already been disposed of in this opinion under the heading, *"The Claims Based on 'Diversion' to and from SIT."* The alternative claim for payment of the movement into SIT, pursuant to Item 145, is governed by our decision in Routed Thru-Pac, Inc. v. United States, *supra,* and is also dealt with in this opinion under the heading, *"Movements of Shipments into and out of SIT."* Therefore, the movement of goods from destination in Brooklyn to SIT at Kearny, New Jersey, was not a compensable movement under either Item 145 or Item 150 of MBT No. 1.

A more difficult question is whether the delivery to a new destination after storage-in-transit should be paid for pursuant to Item 145 rather than Item 150. The difficulty arises from the lack of clarity in MBT No. 1, at least until it was amended on December 7, 1964, after the dates of the shipments in issue. As shown in finding 27, Item 150 of MBT No. 1 broadly defines "Diversion" and then provides the rates for several categories of diversions which are described in specific and detailed language, but none of the categories expressly covers shipments diverted to a new destination point after storage-in-transit.

On the other hand, Item 145 of MBT No. 1, which is set out in finding 26, is entitled "Pick-Up or Delivery Transportation Rates To Apply on Storage-in-Transit Shipments," and therefore purports to cover any delivery after storage-in-transit.

There is no provision in MBT No. 1 which states which of the two items is to prevail when a shipment is diverted after it has been stored in transit. However, a careful examination of both items leads us to the conclusion that Item 145 is applicable to the shipments in issue. We say this because the diverted shipments do not fit into any of the categories that are detailed in Item 150, whereas Item 145 covers any delivery made from a storage-in-transit shipment. In reaching this conclusion, we rely on the rule that in a case where there is a doubt as to the applicability of two tariffs to the same shipment, the more specific tariff will apply. United States v. Gulf Ref. Co., 268 U.S. 542, 546, 45 S.Ct. 597, 69 L.Ed. 1082 (1925); Boone v. United States, 109 F.2d 560, 562 (6th Cir. 1940).

Our holding on the issue is, we think, also supported by Supplement No. 8 to MBT No. 1, which became effective December 7, 1964, and amended Item 150 by adding the following note:

NOTE: When diversion or reconsignment instructions are received while shipment is in storage-in-transit, charges for delivery from storage-in-transit will be those provided in Item 145 herein.

In addition, Supplement 8 added the following new provision to Item 145:

When points are not within the same municipality or not within a distance of 50 miles or less (EXCEPT

for ALASKA see Schedule E), the rates named in this item will not apply. Apply the rates as provided in *SCHEDULE A of Item 150 of this tender*.

Effective as of June 1, 1965, Supplement 9 to MBT No. 1 again amended Item 150 by deleting the note quoted above, but there was left in Item 145 the provision that the rates set out in Item 150 were to be applied to movements in excess of 50 miles.

Since all shipments involved in this issue were made before the effective date of Supplement 8, we are interested in that and subsequent supplements only to the extent that they reveal which item was intended to be controlling in cases of diversions from SIT. For that purpose, we believe that these supplements indicate that, at least previous to June 1, 1965, Item 145 controlled in such situations.

Defendant urges that plaintiff's position respecting the applicability of Item 145 is a newly espoused theory, which was not advanced until after this court's decision in Routed Thru-Pac, Inc. v. United States, *supra*. Defendant also argues that there was always a clear understanding between the parties that compensation for a diversion made while goods were stored in transit was to be compensated under Item 150 and not under Item 145. We do not find that the evidence supports defendant's position. If there was such a "clear understanding," we do not think it was reflected in plaintiff's billing practices, including the supplemental bills submitted by plaintiff. Moreover, bills for these shipments were submitted well in advance of our decision in Routed Thru-Pac, Inc. v. United States, *supra*.

Plaintiff has already been compensated for the shipments discussed under this heading pursuant to Item 150. Therefore, the amounts previously received should be deducted from the compensation that will be due plaintiff under Item 145 in accordance with this decision.

### Defendant's Counterclaim for Appliance Servicing Charges

■ The defendant is asserting in the present action a counterclaim for the recovery of amounts (ranging between $10 and $20) which the plaintiff collected in the form of appliance servicing charges with respect to shipments Nos. 6, 7, 11, 13, 19, 22, 25, 27, and 36. These appliance servicing charges were collected by the plaintiff from the defendant on the basis of claims that it had performed such services in accordance with Item 115 of MBT No. 1. That item was entitled "Household Appliances Or Other Articles Requiring Special Servicing for Safe Transportation."

In support of its counterclaim, the defendant shows that the claims upon the basis of which the defendant paid the particular charges were not adequately supported at the time by the documentary proof required under the defendant's then-current regulations. However, this is not sufficient to justify a judgment for the defendant on its counterclaim.

In the present posture of the case with regard to the appliance servicing charges, the defendant is not resisting the collection of such charges on the ground that they are inadequately supported by documentation. Rather, the defendant is seeking to recover sums of money which it has previously paid to the plaintiff on the basis of the documentation presented at the time by the plaintiff. Therefore, the defendant has the burden of proving that such sums were not due and owing to the plaintiff when they were paid. In order to sustain this burden, the defendant must show that the plaintiff did not perform the appliance servicing for which it billed the defendant and collected the several sums that are now in dispute. This is not accomplished by showing that the claims for the several charges, when presented to the defendant's disbursing officers, were not supported by certain documentary material which the defendant's regulations required and which the defendant's disbursing offi-

cers would have been justified in demanding before paying the charges.

As the defendant has not sustained its burden of proof, the defendant's counterclaim for the recovery of amounts previously paid to the plaintiff in the form of appliance servicing charges with respect to shipments Nos. 6, 7, 11, 13, 19, 22, 25, 27, and 36 should be dismissed.